**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

LUISA ALMESTICA-MENDEZ,

Plaintiff,

v.

EQUIFAX INFORMATION SERVICES, LLC,

Defendant.

**Case No.: 2:26-cv-12355**

**COMPLAINT AND DEMAND FOR JURY TRIAL**

1. **FCRA, 15 U.S.C. § 1681, *et seq.***

Plaintiff Luisa Almestica-Mendez ("Plaintiff"), through counsel, alleges violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq.* against Defendant Equifax Information Services, LLC ("Equifax" or "Defendant").

## I. INTRODUCTION

1. The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2. Unfortunately, however, this information has also become readily available for, and susceptible to, mishandling and misuse. Individual consumers can, and do, sustain substantial damage, both economically and emotionally, when inaccurate or fraudulent information is disseminated and/or published about them. In fact, Defendant acknowledges this potential for misuse and resulting damage every time it sells its credit monitoring services to a consumer.

3. The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4. These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similarly interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, refinancing, a car or mortgage loan or other forms of credit.

5. Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, et seq. ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6. One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

7. The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having her life and character reduced to impersonal "blips" and key-punch holes in a **stolid and unthinking machine which can literally ruin her reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home**. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of her good name without her knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) (quoting 116 Cong. Rec. 36570 (1970)) (emphasis added).

8. In light of these important findings and purposes, Congress specifically

noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." See 15 U.S.C. 1681(a)(4).

9. Plaintiff's Complaint arises out of Defendant's blatantly inaccurate credit reporting, wherein Defendant reported to Plaintiff's potential creditors that Plaintiff owed money on tradelines that Plaintiff is no longer legally responsible for.

10. Accordingly, Plaintiff brings claims against Defendant for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b).

11. Plaintiff's Complaint also alleges that Defendant violated 15 U.S.C. § 1681, *et seq.,* by failing to reasonably investigate Plaintiff's consumer dispute, which resulted in Defendant reporting inaccurate information about Plaintiff.

12. As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from Defendant for its willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.,* as described herein.

## II. **JURISDICTION AND VENUE**

13. The District Court has federal question jurisdiction over these claims pursuant to 28 U.S.C. § 1331; 15 U.S.C. § 1681.

14. Venue in this District is proper pursuant to 28 U.S.C. § 1391 in that a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

15. Defendants transact business here; as such, personal jurisdiction is established.

## III. **PARTIES**

16. Plaintiff is a natural person residing in the city of Taylor, Michigan.

17. Plaintiff is a consumer as defined by the FCRA, 15 U.S.C. § 1681a(c).

18. Defendant Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Upon information and belief, Defendant is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing "consumer reports," as defined in 15 U.S.C. § 1681a(d), to third parties. Equifax's principal place of business is located at 1550 Peachtree Street NW, Atlanta, Georgia, 30309. Equifax can be served through its registered agent, Corporation Service Company, located at 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092.

19. During all times pertinent to this Complaint, Defendant was authorized to conduct business in the State of Michigan and conducted business in the State of Michigan on a routine and systematic basis.

20. Upon information and belief, Equifax disburses consumer reports to third parties under contract for monetary compensation.

21. At all relevant times, Defendant acted through duly authorized agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers.

22. Any violations by Defendant were not in good faith, were knowing, negligent, willful, and/or intentional, and Defendant did not maintain procedures reasonably adapted to avoid any such violations.

## IV. FACTUAL BACKGROUND

### Summary of the Fair Credit Reporting Act

23. The United States Congress decided that the banking system is dependent upon fair and accurate credit reporting. Inaccurate consumer reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continual functioning of the banking system.

24. Congress enacted the FCRA to ensure fair and accurate reporting, promote efficiency in the banking system, and protect consumer privacy.

25. The FCRA seeks to ensure consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy because consumer reporting agencies have assumed such a vital role in assembling and evaluating consumer credit and other consumer information.

26. Defendant reports consumer information about Plaintiff and other consumers through the sale of consumer reports.

27. Defendant's consumer reports generally contain the following information: (i) Header/Identifying Information: this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers; (ii) Tradeline Information: this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment history, and status; (iii) Public Record Information: this section typically includes public record information, such as bankruptcy filings; and (iv) Credit Inquiries: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

28. Defendant obtains consumer information from various sources, including furnishers that provide consumer information to the CRAs, and information the CRAs independently source themselves or through third party providers, vendors or repositories, including computerized reporting services like PACER.

29. Defendant regularly seeks out and procures consumer bankruptcy filing and discharge information on a daily basis, with the intention of including it in the consumer reports Defendant sells to third parties for a profit.

30. The diligence Defendant exercises in uncovering and recording consumer bankruptcy filings is not replicated in Defendant's subsequent reporting of bankruptcy discharges and their effect on consumers' debts.

31. Defendant's unreasonable policies, procedures, and/or algorithms consistently fail to identify and update pre-bankruptcy debts as required by § 1681(e)(b).

32. Defendant knows the information it reports about consumers' bankruptcies is often inconsistent with public records, furnished/reported information, and/or information contained in its own files.

33. The majority of institutions that offer financial services (e.g., banks, creditors, lenders) rely upon consumer reports from CRAs (like Equifax) to make lending decisions. Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models) to interpret the information in a consumer's consumer report, which is based on the amount of reported debt, payment history, and date of delinquencies contained in the Defendant's reports.

34. FICO and other third-party algorithms use variables or "attributes" derived from a consumer's consumer report to calculate a "credit score," which is a direct reflection of a consumer's creditworthiness.

35. The information reported by Defendant contributes to consumer creditworthiness, including their FICO Scores, which are calculated using information contained in the Defendant's consumer reports.

36. FICO Scores factor the following consumer report information: Payment history (35%); Amount of debt (30%); Length of credit history (15%); New credit (10%); and Credit mix (10%).

a. "Payment history" refers to whether a consumer has paid his or his bills in the past, and whether these payments have been timely, late, or missed. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently the delinquency occurred, and how many delinquent accounts exist. The more severe, recent, and frequent late payments are, the greater the harm to the FICO Score.

b. The "amount of debt" a consumer owes has a major impact on his or her credit score. When a CRA reports a debt as outstanding when it is in fact discharged, the CRA is indicating that a consumer's "amount of

debt" is higher than it actually is, which will undoubtably impact a consumer's credit score.

37. Lenders also consider a consumer's debt-to-income ratio ("DTI") based on the total amount of debt reported by Defendant in its consumer reports. DTI compares the total amount a consumer owes to the total amount a consumer earns.

38. Lenders consider a consumer's DTI when deciding whether to approve financing and the credit terms thereof.

39. The higher the amount of reported debt that a consumer has, or appears to have, the worse the consumer's DTI will be, and the more difficult it will be for a consumer to obtain credit and favorable credit terms (e.g., higher interest, lower credit limits).

40. A consumer who has obtained a bankruptcy discharge and has a consumer report that is inaccurately reporting outstanding or past due balances after the bankruptcy discharge suffers greater harm than if that account was accurately reporting as having a zero-dollar balance.

41. Defendant is well aware that the effect of a Discharge Order in a Chapter 7 Bankruptcy is to discharge all statutorily dischargeable debts other than those that have been reaffirmed in a reaffirmation agreement or successfully challenged in an adversary proceeding.

42. Additionally, in or around 2009, Defendant implemented its own automated software "bankruptcy scrub" following the settlement agreement in *White v. Experian Info. Sols.*, No. SACV 05-1070 DOC (MLGx), (C.D. Cal. 2008).

43. The *White* settlement makes clear that the CRAs know or should know that pre-petition, unsecured consumer debts are typically discharged in Chapter 7 proceedings. *Benjamin v. Experian Info. Solutions*, 561 F. Supp. 3d 1330, 1340 (citing *Morris v. Experian Info. Sols.*, 478 F. Supp. 3d at 769).

44. Defendant's bankruptcy scrub software identifies pre-petition accounts and makes assumptions about which accounts were discharged through the Chapter 7 bankruptcy, even when the furnisher does not update the accounts as discharged.

45. In other words, Defendant's automated bankruptcy scrub assumes Defendant's notice of a Chapter 7 discharge is in fact notice that a consumer's pre-petition accounts may be reporting inaccurately, and Defendant will overwrite data reported by a furnisher according to its assumptions and algorithms.

46. However, Defendant has intentionally chosen to disregard knowingly inaccurate open balance and payment obligations of certain types of pre-bankruptcy accounts in Defendant's software programming of its automated "bankruptcy scrub" that it has been employing for well over a decade.

47. Defendant is also aware of the effect of a reaffirmation agreement, which allows a consumer to remain liable for the debt and excludes the debt from the bankruptcy discharge.

48. Information regarding whether a debt has been reaffirmed or successfully challenged through an adversary proceeding is retrievable from the same sources Defendant obtains the bankruptcy case information.

49. Additionally, the Defendant receives actual notice of reaffirmation agreements from furnishers of account/tradeline information.

50. However, Defendant regularly reports inaccurate information about consumers who have received a Discharge Order.

51. Although Defendant was notified of its inaccurate reporting and had the information necessary to correctly report Plaintiff's account, Defendant failed to verify the information.

52. Instead, Defendant followed unreasonable procedures that allowed it to blindly rely on the furnishers' deficient investigation and report its results, despite possessing conflicting information about Plaintiff's accounts.

53. Rather than following reasonable procedures to assure maximum possible accuracy, Defendant inaccurately reports information regarding pre-bankruptcy debts even if that information ignores or contradicts information known and reported by the CRAs themselves.

54. Consumers have filed thousands of lawsuits and FTC and Consumer Financial Protection Bureau complaints against Defendant for its inaccurate reporting following a consumer bankruptcy.

55. Therefore, Defendant is on continued notice of its inadequate post-bankruptcy reporting procedures, including those that result in inaccurate account and payment statuses, both before and after receiving a dispute from the consumer.

**Allegations Specific to the Credit Reporting of Plaintiff**

56. Plaintiff filed for a "no asset" Chapter 7 Bankruptcy on or about September 19, 2025, in the United States Bankruptcy Court for the Eastern District of Michigan, petition no. 25-34210.

57. Plaintiff received an Order of Discharge on or about December 23, 2025.

58. Thereafter, Plaintiff was not personally liable for her dischargeable debts and these debts have a $0 balance after the bankruptcy discharge.

59. Defendant prepared one or more consumer reports concerning Plaintiff after Plaintiff was discharged from Chapter 7 Bankruptcy.

60. Defendant reported Plaintiff's credit history, including names of credit accounts, account numbers, account types, responsibility for the account (i.e., individual or joint accounts), the date the accounts were opened, statuses, and the date of the last status update.

61. Defendant failed to report Plaintiff's consumer bankruptcy information in the Public Records section and/or in one or more individual tradelines of Plaintiff's consumer reports.

62. Notably, the other CRAs, Experian and Trans Union, accurately reported Plaintiff's bankruptcy information in the Public Records sections of their respective reports, and in the individual tradelines of their respective reports.

63. Federal courts have repeatedly held that there is a plausible inference that a CRA failed to follow reasonable procedures when the other CRAs did not make the same type of error. *See Gibson v. Experian Info. Sols*., 494 F. Supp. 3d 613, 617 (E.D. Mo. 2020) ("Lending further plausibility to Plaintiff's allegation that Experian failed to follow reasonable procedures is the fact that neither of the other national CRAs reported the inaccuracy."); *Benjamin v. Experian Info. Sols., Inc*., 561 F. Supp. 3d 1330, 1341 (N.D. Ga. 2021) ("The undisputed evidence that Equifax and Trans Union did not inaccurately report the MoneyLion account is sufficient to create a genuine issue regarding the reasonableness of Experian's procedures."); *Gadomski v. Equifax Info. Servs., LLC*, No. 2:17-CV-00670, 2020 WL 3841041, at *5 (E.D. Cal. July 8, 2020) ("Plaintiff's allegation that Experian and TransUnion did not make the same error also leads to a reasonable inference that Defendant failed to follow reasonable procedures in Plaintiff's case.").

64. Upon information and belief, Defendant received notice of Plaintiff's bankruptcy discharge through its independent collection of Plaintiff's consumer information through vendors such as Lexis-Nexis, as well as from furnishers that provided data regarding the individual tradelines featured on Plaintiff's consumer reports.

65. Defendant also obtains information from other CRAs (who commonly share information).

66. Defendant is aware that CRAs are generally required to report accounts included in a consumer's Chapter 7 bankruptcy with a status of "discharged through bankruptcy," and with a zero-dollar balance, unless a furnisher provides information showing that a specific debt was excluded from the discharge.

67. Defendant should have reported Plaintiff's bankruptcy filing and discharge information in the public records section of Plaintiff's consumer reports.

68. Defendant should have reported **all** of Plaintiff's dischargeable, pre-petition debt as included in or discharged in Chapter 7 Bankruptcy, and with a zero-dollar balance.

69. Rather than accurately report the discharged debts, Defendant reported Plaintiff's accounts with numerous inaccuracies.

*Inaccuracies in Plaintiff's Consumer Report*

70. On or about March 12, 2026, Plaintiff obtained a copy of her Equifax credit report.

71. Upon review of her Equifax credit report, Plaintiff observed several inaccuracies.

72. As a preliminary matter, Equifax did not indicate that Plaintiff had filed for bankruptcy and received a discharge.

73. The name, social security number, and address in Plaintiff's Chapter 7 petition match the information listed on his Equifax consumer report.

74. Defendant failed to report Plaintiff's bankruptcy discharge even though Defendant had all the correct personal information for Plaintiff in its database which matched the personal information reported in Plaintiff's Chapter 7 petition (e.g., full name, social security number, address).

75. Notably, non-parties Experian and Trans Union accurately reported Plaintiff's public record bankruptcy filing and discharge based on the same information.

76. Additionally, furnishers reported the Plaintiff's discharged/zero account balances, bankruptcy and discharge information to Equifax.

77. Defendant knew or should have known that Plaintiff's bankruptcy was discharged.

78. Defendant reported debts that were in fact discharged in bankruptcy and was therefore required to report these as discharged and with zero-dollar balances. However, Defendant's failure to report Plaintiff's bankruptcy – filed in September 2025 and discharged in December 2025 – in Plaintiff's consumer report contributed to the numerous inaccuracies listed in Plaintiff's consumer report.

79. Upon information and belief, the following furnishers of information accurately reported to Equifax that Plaintiff's accounts were included in Plaintiff's bankruptcy discharge and had a zero-dollar balance after the bankruptcy filing/discharge, but Defendant rejected or revoked the data furnished to it and inaccurately overrode the reporting of the accounts.

80. On Plaintiff's consumer disclosure, Defendant inaccurately reported Plaintiff's Self, Inc. account, starting with 8973******* and opened in October 2019 (the "Self Account"), which pre-dated Plaintiff's bankruptcy filing.

81. The Self Account was discharged on or about December 23, 2025. Therefore, the Self Account should have been reported as discharged in bankruptcy and with a zero-dollar balance.

82. However, Defendant inaccurately reported the Self Account with a status of "Charge Off," and with a balance of $201.

83. Additionally, Defendant inaccurately reported Plaintiff's Celtic Bank account, starting with 5346**************** and opened in May 2022 (the "Celtic Account"), which pre-dated Plaintiff's bankruptcy filing.

84. The Celtic Account was discharged on or about December 23, 2025. Therefore, the Celtic Account should have been reported as discharged in bankruptcy.

85. However, Defendant reported the Celtic Account with a status of "Charge Off," and with no indication that the account was discharged in bankruptcy.

86. Additionally, Defendant inaccurately reported Plaintiff's Santander Consumer USA account, starting with 3000**************** and opened in February 2019 (the "Santander Account"), which pre-dated Plaintiff's bankruptcy filing.

87. The Santander Account was discharged on or about December 23, 2025. Therefore, the Santander Account should have been reported as discharged in bankruptcy.

88. However, Defendant reported the Santander Account with a status of "Charge Off," and with no indication that the account was discharged in bankruptcy.

89. Additionally, Defendant inaccurately reported Plaintiff's First Electronic Bank account, starting with LAI0************* and opened in November 2022 (the "FEB Account"), which pre-dated Plaintiff's bankruptcy filing.

90. The FEB Account was discharged on or about December 23, 2025. Therefore, the FEB Account should have been reported as discharged in bankruptcy.

91. However, Defendant reported the FEB Account with a status of "Charge Off," and with no indication that the account was discharged in bankruptcy.

92. Additionally, Defendant inaccurately reported Plaintiff's Upstart Network Inc. account, starting with L234****** and opened in December 2021 (the "Upstart Account"), which pre-dated Plaintiff's bankruptcy filing.

93. The Upstart Account was discharged on or about December 23, 2025. Therefore, the Upstart Account should have been reported as discharged in bankruptcy.

94. However, Defendant reported the Upstart Account with a status of "Charge Off," and with no indication that the account was discharged in bankruptcy.

95. The status of "Charge-Off" in the consumer credit reporting industry means that a debt may still be owed, especially as here, the tradelines do not include bankruptcy coding such as included in and/or discharged in bankruptcy, or the tradeline indicates there is a balance and/or past due balance owed on the account before or after the "Charge-Off."

96. The national consumer reporting agencies specifically acknowledge that a "Charge-Off" generally means consumers are still legally responsible for paying the debt.

97. According to Equifax, a charge-off means the lender has written the account off as a loss and the account is closed to future charges, the time frame is generally between 120 and 180 days after the consumer became delinquent, and a charge-off does not mean that the consumer no longer owes the debt; the consumer is still legally obligated to pay the debt.

98. Equifax's reporting of the Self Account, Celtic Account, Santander Account, FEB Account and Upstart Account (together the "Accounts") was inaccurate.

99. Upon information and belief, Lexis-Nexis furnished information to all three CRAs, including Defendant, that indicated Plaintiff had filed for bankruptcy and received a discharge, but Defendant rejected or otherwise failed to report the data it received.

100. Upon information and belief, some or all of the data furnishers of the foregoing tradelines provided information to all three CRAs, including Defendant, that indicated their corresponding accounts had been discharged in bankruptcy, but Defendant rejected or otherwise overrode the data it received.

101. In addition, public records reflecting Plaintiff's bankruptcy filing and subsequent discharge are readily available to Defendant through multiple sources such as PACER, but Defendant failed to review those sources or knowingly rejected them.

102. In any event, Defendant knew or had reason to know that it reported information contradicted by notices received from third parties.

103. Defendant inaccurately reported that Plaintiff owed money that she did not actually owe, and also reported inaccurate account statuses and payment histories.

104. Defendant inaccurately reported an account with a balance owed after it was discharged in Chapter 7 Bankruptcy.

105. Notably, Experian and Trans Union, the two other national CRAs, reported Plaintiff's Accounts accurately on consumer reports produced after Plaintiff's discharge.

106. Defendant's reporting of the Accounts is patently inaccurate.

107. If not patently inaccurate, Defendant's reporting of the Accounts is materially misleading.

*Plaintiff's Dispute*

108. On or about March 6, 2026, Plaintiff mailed a letter to Equifax disputing its inaccurate reporting.

109. The letter specifically advised that Plaintiff had filed for Chapter 7 bankruptcy in September 2025 and received a discharge in December 2026, and further included Plaintiff's full name, bankruptcy case number, Social Security Number, date of birth, phone number and home address.

110. Upon information and belief, Equifax received Plaintiff's dispute letter.

111. Upon information and belief, Equifax did not respond to Plaintiff's dispute.

112. On or about May 18, 2026, Plaintiff obtained a new copy of her credit report from Equifax.

113. Upon review of her credit report, Plaintiff observed that Defendant was still: 1) not reporting Plaintiff's bankruptcy; and 2) inaccurately reporting the Accounts.

114. Additionally, Plaintiff observed that Defendant was reporting the FEB Account with Narrative Code "174 Amount in High Credit is Original Charge-Off Amount."

115. Additionally, Plaintiff observed that certain accounts that Equifax had accurately been reporting $0 balances for, were now reported with no balance or status at all, implying that the account could be delinquent and/or have a balance owed when the accounts had actually been discharged in bankruptcy.

116. Defendant did not investigate Plaintiff's dispute, pursuant to its unreasonable procedures, despite possessing information indicating the Accounts were included in/discharged in Plaintiff's bankruptcy and/or the ability to independently verify that the Accounts were included in/discharged through the same sources it receives consumer bankruptcy information.

117. Rather than perform a reasonable investigation based on Plaintiff's dispute, readily available public records, and information known by Defendant through Plaintiff's reported payment history on the Accounts, Defendant continued to report the Accounts inaccurately despite awareness that the information was factually inaccurate and conflicted with information known by the CRAs.

*Plaintiff's Damages*

118. Upon information and belief, had Defendant accurately reported the Accounts with correct payment histories and statuses, Plaintiff's credit scores would have been better.

119. Defendant's reporting of debt that Plaintiff does not actually owe negatively increases DTI since the debt is substantially greater, but the income is unchanged.

120. The false increased debt also negatively impacts the 30% of credit score which is based on the debt owed divided by credit limits, which impacts post-discharge consumers even more than those who have not filed bankruptcy.

121. After Plaintiff's bankruptcy discharge, in or around June 2026, Plaintiff applied for credit with Citibank and was approved, but at a lower credit limit and worse overall terms than Plaintiff would have otherwise qualified for, due to Defendant's inaccurate reporting.

122. Defendant's inaccurate reporting of the Accounts, along with additional information belonging to Plaintiff, was published to a potential creditor by Defendant.

123. As a direct result of Defendant's inaccurate reporting, Plaintiff suffers damages, including a decreased credit score, lower overall creditworthiness, and other financial harm, including, but not limited to, denial of credit.

124. As a result of Defendant's conduct, Plaintiff wasted her time, money, and labor by writing and mailing disputes.

125. As a direct result of Defendant's inaccurate reporting, Plaintiff also suffers actual damages in the form of attorneys' fees incurred, related to Defendant's inaccurate reporting

126. Plaintiff also suffered economic damages in the form of attorneys' fees incurred for a necessary review of her credit reports.

127. Additionally, Plaintiff suffers interference with daily activities, as well as emotional distress, including, without limitation, emotional and mental anguish, loss of sleep, reputational damage, violation of privacy, humiliation, stress, anger, frustration, shock, embarrassment, and anxiety. The emotional distress has taken a real toll on Plaintiff, who feels dull and depressed for long bouts of time to the extent of avoiding participating in activities with friends out of fear regarding his financial

situation. These harms are continuing in nature and have adversely affected Plaintiff's quality of life and personal opportunities.

128. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered substantial financial and emotional harm. Prior to filing for bankruptcy, Plaintiff's credit was too poor to secure rental housing or obtain an automobile loan, making ordinary day-to-day activities exceedingly difficult. Seeking a fresh start, Plaintiff filed for bankruptcy and ultimately received a discharge. However, Plaintiff finds himself unable to benefit from the fresh start he earned as Equifax's inaccurate reporting has frozen Plaintiff's debts in place. Plaintiff remains deterred from applying for housing and vehicle financing, reasonably believing he will continue to be denied. As a result, Plaintiff's ability to move forward with his life, rebuild his financial standing, and achieve personal and economic advancement has been significantly delayed and impaired.

129. Defendant's conduct exacerbated Plaintiff's frustration during the already stressful post-bankruptcy period by hindering Plaintiff's ability to rebuild Plaintiff's credit.

## CLAIMS FOR RELIEF

**COUNT I**

**U.S.C. § 1681e(b)**

**Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy**

130. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth herein at length.

131. The FCRA requires CRAs, like Defendant, to maintain and follow reasonable procedures to assure maximum possible accuracy of consumer information. 15 U.S.C. § 1681e(b).

132. Defendant negligently and/or willfully violated 15 U.S.C. § 1681e(b) by failing to use reasonable procedures to assure maximum possible accuracy of Plaintiff's credit information pertaining to pre-bankruptcy debts after the consumer, Plaintiff, received a Discharge Order.

133. Defendant knows or should have known that the effect of a Discharge Order in a no asset Chapter 7 Bankruptcy is to discharge all statutorily dischargeable debts other than those that have been reaffirmed in a reaffirmation agreement or successfully challenged in an adversary proceeding. Defendant knows or should have known of its obligations under the FCRA, especially pertaining to reporting discharged debt with a zero-dollar balance.

134. These obligations are well established by the plain language of the FCRA, as promulgated by the Federal Trade Commission, detailed in case law, and

evidenced in prior cases involving Defendant from which Defendant is on notice of its unreasonable procedures concerning the reporting of discharged debts.

135. Additionally, Defendant possesses or can easily obtain substantial written materials that detail CRA's duties and obligations under the FCRA, including those that apply when consumers file for Chapter 7 Bankruptcy.

136. Despite knowledge of these legal obligations, Defendant willfully and consciously breached its known duties and deprived Plaintiff of his rights under the FCRA.

137. Defendant knows that discharged debts should not be reported as late, past due, or with outstanding balances after the discharge date, and should be reported with a zero-dollar balance.

138. In this case, Defendant regularly conducts voluntary public records searches with the intention of including bankruptcy information on the consumer report it sells to other parties for a profit.

139. Defendant received notice of Plaintiff's bankruptcy and discharge through public records, independent collection of consumer information directly obtained by Defendant through sources of consumer information such as Lexis-Nexis, Defendant's own files, and information provided by data furnishers, yet Defendant rejected the information.

140. Specifically, Defendant knew or should have known about Plaintiff's bankruptcy filing and discharge and failed to include that information in Plaintiff's consumer disclosure and in consumer reports published to third parties.

141. When Defendant received notice of Plaintiff's bankruptcy information, it had an obligation to ensure it reported Plaintiff's discharge and its effects with maximal accuracy.

142. Defendant received notice of Plaintiff's bankruptcy discharge through public records, its own files, and information provided by data furnishers, yet Defendant failed to report Plaintiff's bankruptcy information.

143. As a result, Defendant failed to report Plaintiff's bankruptcy information, and reported the Accounts with statuses other than "discharged in bankruptcy," and/or with balances, instead of zero-dollar balances.

144. Specifically, Equifax inaccurately reported the Accounts, which pre-dated Plaintiff's bankruptcy, and should have been reported as discharged in bankruptcy and with a zero-dollar balance.

145. Defendant's violations of 15 U.S.C. § 1681e(b) were willful.

146. Alternatively, Defendant's violations of 15 U.S.C. § 1681e(b) were negligent.

147. Defendant's inaccurate reporting damaged Plaintiff's creditworthiness.

148. Plaintiff suffers actual damages, including the above-referenced economic damages, a decreased credit score, loss of credit opportunities, credit denial, and other financial harm caused by Defendant inaccurately reporting balances for debts that were discharged in bankruptcy, and otherwise failing to report that the debts were discharged in bankruptcy.

149. Plaintiff also suffers interference with daily activities caused by other harm including, but not limited to, emotional distress, mental anguish, humiliation, stress, anger, frustration, shock, embarrassment, and anxiety.

150. Defendant is a direct and proximate cause of Plaintiff's damages.

151. Defendant is a substantial factor in Plaintiff's damages.

152. Therefore, Defendant is liable for actual and statutory damages, punitive damages, attorneys' fees, costs, as well as other such relief permitted by 15 U.S.C. § 1681, *et seq*.

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform a Reasonable Reinvestigation**

153. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully set forth herein at length.

154. When a consumer disputes the accuracy or completeness of information included in a CRA's credit file, the FCRA requires the agency to either conduct a reasonable reinvestigation into the disputed information or delete the disputed

information from the consumer's credit file within thirty (30) days of receiving notice of the dispute. 15 U.S.C. § 1681i(a)(2)(A).

155. When conducting its reinvestigation of disputed information in a consumer report, the consumer reporting agency is required to "review and consider all relevant information submitted by the consumer."

156. Additionally, the CRA must notify the person who furnished the disputed information of the consumer's dispute within five business days of its receipt. When notifying the furnisher of the consumer's dispute, the CRA is to "include all relevant information regarding the dispute that the agency received from the consumer." 15 U.S.C. § 1681i(a)(2)(A).

157. Thus, in addition to violating the FCRA by failing to follow reasonable procedures as 15 U.S.C. § 1681e(b) requires, Defendant also violated the FCRA by failing to perform a reasonable reinvestigation of the disputed accounts even after Plaintiff notified of the inaccurate information in Plaintiff's credit file.

158. Defendant's violations of 15 U.S.C. § 1681i include, but are not limited to the following:

a. Failing to reasonably reinvestigate the inaccurate information Plaintiff disputed.
b. Failing to consider all relevant information while investigating Plaintiff's dispute.

c. Failing to include all relevant information when notifying furnishers of Plaintiff's dispute.

159. Instead of reasonably reinvestigating Plaintiff's dispute, Defendant continued to report Plaintiff's accounts and public record information inaccurately after Plaintiff's bankruptcy discharge.

160. Defendant's inaccurate reporting damaged Plaintiff's creditworthiness.

161. Plaintiff suffers actual damages, including a decreased credit score, loss of credit opportunities, credit denial, and other financial harm caused by Defendant inaccurately reporting a balance for a debt that was discharged in bankruptcy, and otherwise failing to report that the debt was discharged in bankruptcy.

162. Plaintiff also suffers interference with daily activities caused by other harm including, but not limited to, emotional distress, mental anguish, humiliation, stress, anger, frustration, shock, embarrassment, and anxiety.

163. Defendant is a direct and proximate cause of Plaintiff's damages.

164. Defendant is a substantial factor in Plaintiff's damages.

165. Defendant's acts, as described above, were done willfully and knowingly; or, alternatively were committed negligently.

166. Therefore, Defendant is liable for actual and statutory damages, punitive damages, attorneys' fees, costs, as well as other such relief permitted by 15 U.S.C. § 1681, *et seq*.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

i. Declaratory judgment that Defendant violated the FCRA, 15 U.S.C. § 1681e(b);

ii. Declaratory judgment that Defendant violated the FCRA, 15 U.S.C. § 1681i;

iii. An award of actual, statutory, and punitive damages as provided by the FCRA;

iv. Awarding costs and reasonable attorneys' fees pursuant to FCRA 15 U.S.C. § 1681n(a)(3) and § 1681o(a)(2); and

v. Granting further relief, in law or equity, as this Court may deem appropriate and just.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues triable by jury.

///

RESPECTFULLY SUBMITTED on July 10, 2026.

*/s/ Landon T. Maxwell*
Landon T. Maxwell, AZ #038439
CONSUMER JUSTICE LAW FIRM PLC
8095 N. 85th Way
Scottsdale, AZ 85258
T: (480) 626-1975
F: (480) 613-7733
E: lmaxwell@consumerjustice.com

*Attorney for Plaintiff*
*Luisa Almestica-Mendez*